IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br><br><br>        vs.<br><br><br>COLIN MCCABE (d/b/a ELITE STOCK REPORT, THE STOCK PROFITEER, and RESOURCE STOCK ADVISOR),<br>        Defendant. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS<br><br><br><br><br><br>Case No. 2:13-CV-161 TS |

This matter is before the Court on Defendant Colin McCabe's Motion to Dismiss.[1]  For the reasons set forth below, the Court will grant in part Defendant's Motion without prejudice, and deny the remainder of the Motion.

## I.  BACKGROUND

Defendant is a stock promoter who publishes, on his own, three newsletters containing stock recommendations.  In 2006, Defendant began publishing the Elite Stock Report under his

---

[1]Docket No. 16.

own name.  The other two newsletters are published under pseudonyms.  In 2009, Defendant

began publishing the Stock Profiteer under the name Joe Marino, and the Resource Stock

Advisor under the name Roger Gaines.  Subscribers paid annual fees to receive Defendant's

newsletters.  Defendant was also paid by companies to promote their stock in separate

advertisements.  Over the years, Defendant received more than $16 million for his promotion

work.  The SEC alleges that Defendant recommended these stocks to his paid subscribers based

on misrepresentations and without disclosing the payments he received to promote the stocks.  In

particular, an advertisement published under the Elite Stock Report masthead described Guinness

Exploration, Inc.'s ("Guinness") acquisition of property in Yukon gold territory.  The SEC

alleges that Defendant's statements in that publication were misrepresentations.  Consequently,

the SEC brought this enforcement action alleging violations of § 10(b) of the Securities and

Exchange Act of 1934 and Rule 10b-5(b), promulgated thereunder.  On July 22, 2013, Defendant

filed a Motion to Dismiss all of Plaintiff's claims.

## II.  DISCUSSION

Plaintiff alleges Defendant violated § 10(b) of the Securities Exchange Act of 1934[2] and

Rule 10b-5(b),[3] promulgated thereunder.  "The scope of Rule 10b-5 is coextensive with the

coverage of § 10(b)."[4]  Therefore, "in an SEC enforcement action" pursuant to § 10(b) and Rule

10b-5(b), Plaintiff must prove that Defendant "(1) made a misrepresentation or omission, (2) of

---

[2]15 U.S.C. § 78j(b) (2006).

[3]17 C.F.R. § 240.10b-5(b) (2013).

[4]*SEC v. Wolfson*, 539 F.3d 1249, 1256 n.11 (10th Cir. 2008) (quoting *SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002)).

material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, and (5) by virtue of the requisite jurisdictional means."[5]  Plaintiff advances three theories to support Defendant's liability under § 10(b) and Rule 10b-5(b).

First, Plaintiff argues that Defendant misrepresented the research that supported the stock recommendations contained in Defendant's various newsletters.  In response, Defendant argues that Plaintiff's Complaint fails to plead with sufficient particularity and relies on statements that are puffery, immaterial, or were not made in connection with the purchase or sale of a security.

Second, Plaintiff argues that Defendant failed to disclose payments Defendant received from the companies whose stock Defendant promoted in various newsletters.  In response, Defendant argues that Defendant did not have a fiduciary relationship with the newsletter subscribers and therefore lacked a duty to disclose any such payments.  Moreover, Defendant contends that Plaintiff is unable to demonstrate scienter because Defendant had no reason to mislead the subscribers to his newsletters.

Third, Plaintiff argues that Defendant made misrepresentations regarding Guinness's assets to bolster Defendant's recommendation to purchase Guinness stock.  In response, Defendant argues that Plaintiff mischaracterizes Defendant's statements about Guinness's assets, that the statements were immaterial, and that Plaintiff failed to allege falsity of one of the statements.

On a 12(b)(6) motion to dismiss, the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."[6]  "[C]ourts

---

[5]*Id.* at 1256.

[6]*Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

3

must consider the complaint in its entirety, . . . [including] documents incorporated into the complaint by reference . . . ."[7]  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[8]  But, the Court "will disregard conclusory statements."[9]

Claims for securities fraud are subject to the heightened pleading standard reflected in Rule 9(b) of the Federal Rules of Civil Procedure.[10]  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[11]  "As interpreted, the rule requires a plaintiff to identify the time, place, and content of each allegedly fraudulent representation or omission, to identify the particular defendant responsible for it, and to identify the consequences thereof."[12]

Defendant argues that all three of Plaintiff's theories fail; consequently, Defendant argues that all claims should be dismissed for failure to state a claim.

A.    MISREPRESENTED RESEARCH

Plaintiff argues that Defendant misrepresented the extent of the research Defendant conducted in support of the stock recommendations he published in various newsletters and that

---

[7]*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[8]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[9]*Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

[10]*See Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1242 (D. Utah 1999).

[11]Fed. R. Civ. P. 9(b).

[12]*Karacand*, 53 F. Supp. 2d at 1241 (citing *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1251 (10th Cir. 1997)).

Defendant published newsletters under pseudonyms to bolster the stock recommendations he made in his own name.  Defendant argues that (1) Plaintiff failed to plead the alleged misrepresentations with sufficient particularity; (2) the statements describing Defendant's research were mere puffery; (3) Defendant's use of a pseudonym and references to a research team were not material; (4) Plaintiff failed to allege that the research claims were misrepresentations; and (5) many of the statements regarding Defendant's research were not made in the newsletters, but on websites and that these statements did not reference any particular security and therefore were not made in connection with a security.

   1.    *Pleading with Particularity*

Defendant argues that Plaintiff's Complaint fails to plead with sufficient particularity the alleged misrepresentation regarding the research conducted in support of Plaintiff's stock recommendations.  "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud."[13]  Plaintiff's Complaint includes the following general description of the alleged misrepresentations:

> Beginning in 2006, when [Defendant] began publishing Elite Stock Report, and in 2009, when [Defendant] began publishing The Stock Profiteer and Resource Stock Advisor, [Defendant] falsely claimed that his Elite Stock Report, The Stock Profiteer and Resource Stock Advisor publications were the result of extensive research conducted by researchers with relevant expertise and contacts.  In fact, [Defendant]'s research was limited to reviewing issuer filings with the Commission, press releases, and the issuer website.  He did not have any assistance in researching stocks or writing his publications.  These false and misleading statements are believed to have continued through 2011, when

---

[13]*Two Old Hippies, LLC v. Catch the Bus, LLC*, 784 F. Supp. 2d 1200, 1208 (D. N.M. 2011) (citation and internal quotation marks omitted).

[Defendant] claims to have ceased publishing Elite Stock Report, The Stock Profiteer and Resource Stock Advisor.[14]

Plaintiff's Complaint goes on to allege more specific facts:

> In the January 2009 issue of Elite Stock Report, [Defendant] falsely claimed that "[w]e research every company intensely and no company gets the go ahead unless they pass the 'Profit-Potential Checklist.'  One of the must-haves on that list is a high probability of big, juicy returns.  Triple-digits minimum." . . .
>
> Elite Stock Report's website also falsely claimed that [Defendant] identified his recommendations "[t]hrough his network of global connections" and claimed that "his contacts extend deep into the world's hottest resource investment zones—particularly Asia, Europe, and of course, North America—resulting in a wealth of knowledge and opportunity for his readers." . . .
>
> . . . .
> Similarly, [Defendant] falsely represented on The Stock Profiteer website that a "research team" made the stock recommendations in The Stock Profiteer. [Defendant] claimed that "[o]ur research team has hundreds of information sources and contacts, and years of experience in the analysis of small stocks." . . .
>
> [Defendant] claimed on the Stock Profiteer website that his researchers applied a "scientific (and proven) selection methodology to small stocks" . . . [and that] recommended stocks were identified by "my time-tested, proprietary investing methodology." . . .
>
> [Defendant] also misled readers about who prepared The Stock Profiteer publications. . . .  The Stock Profiteer publications consistently stated that Joe Marino was the editor [even though] Joe Marino never existed and is an alias used by [Defendant].
>
> [Defendant] made similar false statements with respect to Resource Stock Advisor in various publications between 2009 and 2011. . . .  Resource Stock Advisor's website claimed that [Roger Gaines] is "[a] highly-trained economist who can spot trends before they happen, Roger Gaines spent most of the last decade either working 'in the trenches' of Wall Street or traveling the globe in search of the world's best resource investment opportunities."  However, Roger Gaines never existed and is simply another alias used by [Defendant]. [Defendant] has no experience "working 'in the trenches' of Wall Street" . . . [and] did not travel the world in search of resource companies to recommend to his readers.[15]

---

[14]Docket No. 2 ¶ 19.

[15]*Id.* ¶¶ 20–21, 23–26 (second alteration in original).

Plaintiff alleges with particularity where, how, and to whom Defendant made the statements—by publishing the statements to readers of Defendant's newsletters and on the newsletters' websites.  Plaintiff also states with particularity the timing of at least one misrepresentation—the January 2009 issue of the Elite Stock Report.  Finally, Plaintiff alleges with particularity the consequence of the statements—that readers were misled by the statements. In so doing, Plaintiff satisfied the heightened pleading standards under Rule 9(b) and "nudged [its] claims across the line from conceivable to plausible."[16]  Therefore, the Court finds that dismissal on these grounds is not proper.

> 2.    *Puffery*

Defendant argues that Plaintiff's allegations concerning misrepresented research are based on statements that are mere puffery and therefore are not material statements sufficient to satisfy the second element of a § 10b claim.

"A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock."[17]  The Tenth Circuit has recognized that puffing statements are immaterial as a matter of law.[18]  "[V]ague statements of corporate optimism"—often called puffing statements—"are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification."[19]  Similarly, a puffing statement is a "rosy affirmation commonly heard from corporate managers and

---

[16]*Twombly*, 550 U.S. at 570.

[17]*Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).

[18]*SEC v. Curshen*, 372 F. App'x 872, 879 (10th Cir. 2010).

[19]*Grossman*, 120 F.3d at 1119.

numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so

lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable

investor could find them important to the total mix of information available."[20]

Defendant correctly points the Court to many puffing statements quoted in Plaintiff's

Complaint, such as: Defendant's research was "extensive," "in-depth," and "ground breaking";

recommended stocks must show "a high probability of big, juicy returns"; and a certain

investment was a "sure-fire grandslam."

However, some of Defendant's statements are objectively verifiable assertions that could

affect a reasonable investor's decision to purchase a stock.  For example, Plaintiff alleges that

Defendant's statements imply that Defendant's stock recommendations were supported by

research derived from the work of a team comprised of multiple analysts, with significant

experience and contacts.  Whether research has been subjected to the scrutiny of an experienced

team is objectively verifiable and would likely be a highly relevant consideration for a reasonable

investor.  Second, Plaintiff alleges that Defendant misrepresented the metrics by which he

selected stocks to recommend.  Defendant claimed to use a "time-tested proprietary investing

methodology" whereby any stock Defendant recommended satisfied criteria Defendant described

as the "Profit-Potential Checklist."  Plaintiff alleges that no such system existed; rather, Plaintiff

alleges, Defendant recommended the stock of companies who had paid Defendant to promote

their stock.  Defendant's use of a methodology based on returns is objectively verifiable and the

absence of one would likely affect a reasonable investor's decision to invest based on

---

[20]*Curshen*, 372 F. App'x at 879.

Defendant's recommendation.  Based on the foregoing, the Court finds that dismissal on these grounds is not proper.

    *3.*     *Pseudonym*s

    Defendant argues that his alleged use of pseudonyms was not material because the names under which Defendant published would not have had significance to an investor.  Defendant directs the Court's attention to language from *SEC v. Pirate Investor, LLC*,[21] where the Fourth Circuit describes the materiality of a statement in relation to the speaker's identity[22]—in particular, Defendant characterizes the rule as requiring the speaker to be purporting to communicate inside information or that the speaker be so notorious (such as Warren Buffett) that any investor would follow the speaker's recommendation.  Defendant's interpretation overstates the holding and would transform the Tenth Circuit's formulation of materiality in this context.

    First, the Fourth Circuit explains that the statement at issue in *Pirate Investor* was material because the speaker claimed to communicate inside information.[23]  That court does not articulate a rule requiring such a claim for a statement to be material.  Rather, under the Fourth Circuit's rationale, a speaker claiming to communicate inside information is a sufficient, but not necessary, condition for materiality.  This holding is therefore inapplicable to the instant case.  Second, as described above, in the Tenth Circuit, "[a] statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock."[24]

---

[21]580 F.3d 233 (4th Cir. 2009).

[22]*Id.* at 240–41.

[23]*Id.* at 241.

[24]*Grossman*, 120 F.3d at 1119.

When applying the Tenth Circuit's standard, this Court has described a two-step test for materiality: "A court must first determine whether the information would be considered important by a reasonable investor; if so, the court must then determine whether the information would still be considered important in light of other information already available to the market."[25]

Plaintiff's Complaint alleges that Defendant published under three separate names to promote the stocks of companies. Plaintiff's allegations regarding Defendant's alias, Joe Marino, do not contain explicit indications that a reasonable investor would rely on any recommendations by Joe Marino. The allegations describe an announcement made to Defendant's existing subscribers recommending Joe Marino's new newsletter. Taking these facts in the light most favorable to Plaintiff, it is reasonable to infer that subscribers are more likely to find Defendant's recommendations credible, including those about Joe Marino's abilities. After all, the subscribers paid an annual fee to receive Defendant's recommendations. The subscribers presumably valued Defendant's recommendations. As such, Defendant's statements under the name Joe Marino would be important to a reasonable investor and would be considered important in light of the other information available in the market, and are therefore material.

Plaintiff has also properly pleaded allegations regarding the materiality of statements by Defendant's other alias, Roger Gaines. Plaintiff alleges that Defendant's Resource Stock Advisor website described Roger Gaines as "[a] highly-trained economist who can spot trends before they happen, [and who] spent most of the last decade either working 'in the trenches' of

---

[25]*Karacand*, 53 F. Supp. 2d at 1242.

Wall Street or traveling the globe in search of the world's best resource investment opportunities."[26]

Defendant asserts that he holds a bachelor's degree in Economics.  Setting aside the question of whether a bachelor's degree, on its own, justifies the description of "highly trained" in the context of stock market analysis, Plaintiff's allegations are sufficient for other reasons. Plaintiff alleged Defendant neither worked on Wall Street nor traveled the world researching resource companies.  It is self-evident that Defendant promoted these credentials in an attempt to convince investors to follow his advice while publishing under the alias Roger Gaines.  Where, as Plaintiff has alleged, Defendant coordinated the messages of his various publications to promote certain stocks, it seems likely that a reasonable investor would be influenced by statements made by Defendant under the Roger Gaines pseudonym and that those statements would still be important to the investor in light of other information available in the market. Based on the foregoing, the Court finds that dismissal on these grounds is not proper.

    *4.*    *Misrepresentation of Research Claims*

Defendant argues that because Plaintiff's allegations are based on puffing statements, the allegations regarding deficient research amount to nothing more than allegations that Defendant conducted no research at all.  As such, Defendant argues, because Plaintiff did not plead that Defendant conducted no research, then the claim fails for lack of a misrepresentation.  As explained above, Defendant's arguments regarding puffing statements fail.  Plaintiff alleges, with

---

[26]Docket No. 2 ¶ 26.

particularity, objectively verifiable misrepresentations about the nature of Defendant's research. Therefore, dismissal on these grounds is not proper.

   5.    *"In Connection With" a Security*

Defendant argues that most of the statements relied on by Plaintiff were not made in the subscriber newsletters but were instead made on websites advertising the newsletters; consequently, these statements were not made in connection with the sale of a security. Defendant also argues that many of these statements do not refer to any particular security, but are merely generalized statements about the newsletters or Defendant's business.

"The Supreme Court has consistently embraced an expansive reading of § 10(b)'s 'in connection with' requirement,"[27] however, § 10(b) "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation."[28]  The statute should be interpreted "flexibly to effectuate its remedial purpose."[29]  As such, "it is enough that the fraud alleged 'coincide' with a securities transaction."[30]  "The Tenth Circuit has held that 'misrepresentations meant to induce a party to purchase a security *or to influence an investment decision* are made in connection with the purchase or sale of a security.'"[31]

Plaintiff alleges that in January 2009, the Elite Stock Report—published under Defendant's own name—contained misrepresentations about the research supporting

---

[27]*Wolfson*, 539 F.3d at 1262.

[28]*Zandford*, 535 U.S. at 820.

[29]*Id.* at 819.

[30]*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006).

[31]*SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012) (quoting *Wolfson*, 539 F.3d at 1262).

Defendant's stock recommendations.[32]  Defendant allegedly claimed, "We research every company intensely and no company gets the go ahead unless they pass the 'Profit-Potential Checklist.'  One of the must-haves on that list is a high probability of big, juicy returns.  Triple-digits minimum."[33]  The Elite Stock Report's website allegedly claimed that the report's research derives from a "network of global connections" that "extend deep into the world's hottest resource investment zones—particularly Asia, Europe, and of course North America—resulting in a wealth of knowledge and opportunity."[34]  The Stock Profiteer's website made similar claims: "Our research team has hundreds of information sources and contacts, and years of experience in the analysis of small stocks."[35]

Nearly all of Plaintiff's research allegations describe statements made on the websites of Defendant's newsletters.  Plaintiff alleges misrepresentations about research in the Elite Stock Report's January 2009 issue, but does not allege any specific statements in that issue regarding a particular security.  Instead, Plaintiff's allegations of specific stock recommendations focus on Defendant's promotion of Global Health Ventures Inc. stock in the October 9, 2009 issue of the Elite Stock Report and multiple Stock Profiteer mailings between October 9, 2009 and May 2010; Guinness Exploration's stock in the Elite Stock Report beginning in January 2010; and Titan Oil & Gas, Inc.'s stock in the Resource Stock Advisor from January 2010 to March 2011. Plaintiff has failed to allege—with the particularity required by Rule 9(b)—facts demonstrating

---

[32]Docket No. 2 ¶¶ 20, 22.

[33]*Id.* ¶ 20.

[34]*Id.* ¶ 21.

[35]*Id.* ¶ 23.

that Defendant's statements about research coincide with a particular securities transaction;
instead, as pleaded, the statements appear to be general statements promoting the newsletters
themselves, unconnected to promoting any particular security.  Although Plaintiff has alleged
with particularity Defendant's research statement in the January 2009 issue of the Elite Stock
Report, Plaintiff has not alleged with particularly any stock recommendations in that same issue,
such that the alleged misrepresentations could be said to coincide with a securities transaction.
Based on the foregoing, the Court finds that Plaintiff has failed to allege with sufficient
particularity how Defendant's research statements were made in connection with the purchase or
sale of a security and will grant in part Defendant's Motion to Dismiss, without prejudice, on
Plaintiff's misrepresented research theory.

B.      FAILURE TO DISCLOSE PAYMENTS

Defendant argues that he did not have a fiduciary relationship with the newsletter
subscribers and therefore had no duty to disclose any payments received for promoting certain
stocks.  Moreover, Defendant argues that Plaintiff cannot demonstrate scienter because
Defendant had no reason to mislead Defendant's loyal, paying subscribers by promoting
valueless stocks.

    1.    *Duty to Disclose*

"A failure to disclose is actionable as fraud under § 10(b) of the Securities Exchange Act
of 1934 only if 'one party has information that the other party is entitled to know because of a
fiduciary or other similar relation of trust and confidence between them.'"[36]  As a newsletter

---

[36]*SEC v. Cochran*, 214 F.3d 1261, 1264 (10th Cir. 2000) (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).

publisher, Defendant was not in a traditional fiduciary role vis-à-vis Defendant's subscribers.   In

the Tenth Circuit, "a duty to disclose under § 10(b) may be present if . . . a state statutory or

common law recognizes a fiduciary or similar relationship of trust and confidence giving rise to

such a duty between the defendant and the plaintiff."[37]   Under this analysis, the Court applies the

law of the state of the locus of the parties' relationship.[38]   But the nature of the Defendant's

relationship with his subscribers is such that it is difficult to determine any particular locus.

Plaintiff alleges that Resource Stock Advisor operated using a Utah mailing address, so

the Court will look to Utah law to determine whether a duty to disclose arises from a state statute

recognizing a relationship of trust and confidence.

Utah's Uniform Securities Act ("Act") states,

> (1) It is unlawful for any person who receives any consideration from
> another person primarily for advising the other person as to the value of securities
> or their purchase or sale, whether through the issuance of analyses or reports or
> otherwise to:
> . . . .
> (b) engage in any act, practice or course of business which operates or
> would operate as a . . . deceit upon the other person . . . .[39]

Under Utah law, Defendant had a duty to not engage in conduct that would deceive the

paying subscribers to Defendant's newsletter.   The Act also explains that the term "deceit" is

"not limited to [its] common-law meaning[]."[40]   *Black's Law Dictionary* defines deceit as "[t]he

---

[37]*Id.* at 1265.

[38]*Id.*

[39]Utah Code Ann. § 61-1-2 (2011).

[40]*Id.* § 61-1-13(o).

act of intentionally giving a false impression."[41]  *The New Oxford American Dictionary*'s definition is similar: "the action or practice of deceiving someone by concealing or misrepresenting the truth."[42]  Under either the common law meaning reflected in *Black's Law Dictionary* or the standard usage meaning reflected in the *New Oxford American Dictionary*, a person paid to provide investment advice likely acts deceitfully by failing to disclose material information regarding the reliability of the analysis—such as financial motives that might influence the advice.  Therefore, the relevant inquiry is whether the payments received by Defendant to promote certain companies' stock is material information, such that the omission of this information would act to misrepresent the truth or give a false impression.

To determine whether information is material, this Court has applied the following test: "A court must first determine whether the information would be considered important by a reasonable investor; if so, the court must then determine whether the information would still be considered important in light of other information already available to the market."[43]

When seeking insight into the stock market in the hope of investing wisely, the reasonable investor would likely find it important that a stock advisor was being paid at that time to promote certain stocks and that the advisor's recommendations were not impartial. Defendant's publication of two different newsletters under pseudonyms underscores the materiality of this information.  Defendant bolstered the recommendations in the Elite Stock Report with the other two newsletters.  Consequently, Defendant was able to manipulate the

---

[41]Black's Law Dictionary 465 (9th ed. 2009).

[42]New Oxford American Dictionary 448 (3d ed. 2010).

[43]*Karacand*, 53 F. Supp. 2d at 1242.

16

other information available in the market—providing confirmation that the recommendations in the Elite Stock Report were impartial and well founded.  Subscribers to the Elite Stock Report would consider it important that the publisher of the Elite Stock Report was being paid to promote recommended stocks in other publications.

Defendant argues that recognizing a duty to disclose such payments would create absurdly expansive paid-promoter liability, whereby any promoter would be required to disclose prior payments in any reference to any stock that the promoter previously promoted.  The Tenth Circuit's materiality test does not lead to such an expansive result.  Rather, under that test, a paid-promoter would not have a duty to disclose prior payments that are no longer materially relevant to stocks presently being promoted.  Based on the foregoing, the Court finds that dismissal on these grounds is not proper.

  2.  *Scienter*

Defendant argues that Plaintiff's claim fails for lack of scienter because Defendant had no rational reason to make misrepresentations to paying subscribers of the newsletters.

In the Tenth Circuit, "recklessness satisfies the scienter requirement" of § 10(b).[44] "Recklessness is defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"[45]

---

[44]*Hackbart v. Holmes*, 675 F.2d 1114, 1117 (10th Cir. 1982), *abrogated on other grounds by Anixter v. Home-Stake Prod. Co.*, 939 F.2d 1420 (10th Cir. 1991).

[45]*Dronsejko v. Thornton*, 632 F.3d 658, 665 (10th Cir. 2011) (quoting *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001)).

The Tenth Circuit implicitly acknowledged the existence of some duty of care owed by penny-stock newsletter publishers to their subscribers in *United States v. Wenger*.[46]  In *Wenger*, the court affirmed the publisher's conviction for securities fraud under § 10(b) for failing to disclose material facts that would have affected his subscribers' decisions to invest in the recommended stocks.  Specifically, the publisher failed to disclose the fact that the publisher was selling stock in the company being promoted in the publisher's newsletter.[47]

Here, Plaintiff sufficiently pleaded facts indicating Defendant similarly misled buyers and likely breached his duty of care by recommending stocks in Defendant's newsletters without disclosing the payments Defendant received to promote those stocks.  Moreover, Defendant had a rational reason to make misrepresentations to the subscribers: Plaintiff alleges that Defendant's multi-publication operation "had the effect of quickly boosting the volume and price of the stocks he recommended,"[48] thereby providing Defendant with the ability to claim that he had made profitable recommendations in the past.  Based on the foregoing, the Court finds that dismissal on these grounds is not proper.

C.    MISREPRESENTATIONS ABOUT GUINNESS

Plaintiff alleges that Defendant made the following misrepresentations about Guinness:

> [Defendant] falsely represented that Guinness had acquired an 8,000 acre property in the middle of the Tintina Gold Belt in the Yukon Territory of Canada well before discoveries in May 2009 turned the region into "a red-hot area play." [Defendant] also claimed that the property held "an estimated recoverable resource in excess of 1 million ounces of gold."

---

[46]427 F.3d 840 (10th Cir. 2005).

[47]*Id.* at 843.

[48]Docket No. 2 ¶ 17.

. . . In fact, Guinness had not purchased the relevant property until November 2009—well after the May 2009 discoveries that [Defendant] claimed increased the value of the property. . . . Moreover, Guinness never claimed that its property held "an estimated recoverable resource in excess of 1 million ounces of gold" . . . .[49]

Defendant argues that the timing of Guinness's property acquisition is misstated by Plaintiff and, in any event, immaterial.  Defendant also argues that Plaintiff misstates Defendant's statements regarding the amount of gold associated with Guinness's property.  Finally, Defendant concedes that Guinness never asserted that its property held an estimated 1 million ounces of gold.  Instead, Defendant points out that Defendant made the assertion, and argues that Plaintiff failed to allege falsity of Defendant's assertion.  Plaintiff's Complaint incorporates by reference the February 2010 Elite Stock Report and Defendant attached significant portions of the document to his Motion to Dismiss.  Because the document was incorporated by reference in the Complaint and its authenticity is not disputed, the Court will evaluate the newsletter along with Plaintiff's allegations.

1.    *Misstated Timing*

Defendant argues that Plaintiff's Complaint incorrectly claims that Defendant's newsletter advised readers that Guinness acquired the property prior to May 2009.  It is not clear that this is correct.  Moreover, construing the facts in the light most favorable to Plaintiff leads the Court to a different interpretation.  Plaintiff alleges that Defendant advised his subscribers that Guinness obtained its property before the region turned into a "red-hot area play" as a result of the May 2009 discovery, but that Guinness in fact obtained the property in November 2009,

---

[49]*Id.* ¶¶ 34–35.

long after values had increased.  Therefore, the Court finds that Plaintiff pleaded facts consistent with the statements contained in the February 2010 newsletter incorporated by reference, and consequently, dismissal is not appropriate on these grounds.

    2.    *Timing Immaterial*

Defendant also briefly argues that the timing of Guinness's property acquisition is not a material statement because an investor would only be concerned with Guinness's ownership at the time the statement was made and the value of the property, not whether Guinness had obtained the property months earlier.  Defendant's own newsletter colorfully describes why the timing of Guinness's acquisition would be material to an investor:

> [W]hat makes Guinness Exploration so special?
>     Listen, for starters their land was acquired *well before* the staking rush turned the entire region into a red-hot area play.  That means they had their pick before everyone else.  It's a bit like they were the first in line at a buffet—they had their choice of the best of everything[,] while everyone else got the leftovers.[50]

As Defendant explained in the newsletter, the timing was precisely the reason why Guinness stock was a wise investment.  If Guinness truly did have its choice of the best land in this gold-rich zone, then Guinness was more likely to discover gold, which would raise Guinness's stock value.  Therefore, the Court finds that dismissal on these grounds is not proper.

    3.    *Gold Content Misstated*

Plaintiff alleges that Defendant "claimed that [Guinness's] property held an estimated recoverable resource in excess of 1 million ounces of gold."[51]  Defendant argues that this is a misstatement.  Rather, Defendant argues that he made this claim about a larger zone within

---

[50]Docket No. 16 Ex. A, at 4.

[51]Docket No. 2 ¶ 34 (internal quotation marks omitted).

which Guinness's property was located.  Referring to the newsletter itself, Defendant's exact language is as follows: "[Guinness] acquired an advanced property over a zone with 8,000 meters of drilling and 400 drill holes—and an estimated recoverable resource in excess of 1 million ounces of gold."[52]

This sentence fairly supports the two opposing interpretations advanced by the parties. The use of the word "over" could mean that Guinness's property encompasses the entire zone that possibly contains gold.  On the other hand, it could mean that Guinness's property is a smaller portion of a larger zone, and that the larger zone possibly contains the gold.  A statement on a subsequent page of the newsletter is potentially illuminating: "If [Guinness] is sitting in a million-ounce gold zone . . . then we're looking at a project that is potentially worth several hundred million dollars."[53]  Here, Defendant describes Guinness's property as sitting in the zone, not on the zone.  This statement favors Defendant's interpretation.  Nonetheless, this is a close call, with plausible interpretations supporting either party's position.  But, viewing the facts in the light most favorable to Plaintiff, a plausible interpretation of the newsletter supports Plaintiff's allegation.  Therefore, the Court finds that dismissal on these grounds is not proper.

### 4.    Failure to Allege Falsity

Finally, Defendant argues that Plaintiff failed to allege the falsity of the statement concerning the amount of gold in Guinness's property.  Defendant argues that Plaintiff's Complaint explains that Defendant made the statement, but that the statement was untrue because Guinness never made the statement.  In making his argument, Defendant omits a key

---

[52]Docket No. 16 Ex. A, at 4.

[53]*Id.* at 6.

21

phrase in Plaintiff's allegation.  Alleging the falsity of Defendant's representation, Plaintiff

states, "Guinness never claimed that its property held 'an estimated recoverable resource in

excess of 1 million ounces of gold,' and [Defendant]'s representations in this regard were false

and misleading."[54]  Viewing the facts in the light most favorable to Plaintiff, Plaintiff alleges that

Defendant made representations regarding the amount of gold in Guinness's property and that

those representations were false and misleading.  Therefore, the Court finds that dismissal on

these grounds is not proper.

III.  CONCLUSION

Based on the foregoing, it is hereby

ORDERED that Defendant's Motion to Dismiss (Docket No. 16) is GRANTED IN

PART as to Plaintiff's misrepresented research theory, and DENIED IN PART as to Plaintiff's

other theories.  Pursuant to the terms of this Order, Plaintiff's misrepresented research theory

claim is dismissed without prejudice.

DATED   November 26, 2013.

BY THE COURT:

TED STEWART
United States District Judge

---

[54]Docket No. 2 ¶ 36.